Good morning, Your Honor. May it please the Court. This case is one before your honor. I always say it's an important case, but it is. It involves the standard payment clause in fixed price construction contracts. It also involves the scheduling clause that are found in fixed price construction contracts. I would like to hand up, if I may have permission, the standard scheduling clause because the Board only quoted Part A of the scheduling clause, not the entire clause B and C. And if the Court wouldn't mind looking at the entire clause, then you can see the argument that A only applies to what we call a base schedule, a baseline schedule, the initial schedule to be submitted by the contractor at the start of the project. And that's what A goes to. If you look at clause B of the scheduling clause. But, Counselor, your client said it wouldn't perform, it wouldn't provide temporary power. Yes. And the Government found that, and the Board found that that was a repudiation of the contract. Yes. What this case really involves, or I'll call it the elephant in the room, really involves a first breach. What happened is the Government stopped paying after March 1st for not only the fuel and generators, but also 100% of the progress payments. And that occurred... Is your dispute 100% versus 10%? Is that the point? Excuse me, Your Honor. Is it a question of whether they could withhold 100% rather than 10%? Is that the issue? That's the issue. The payment clause that's in the contract and in the FARS said that if, in fact, you're not performing on time, you're not performing correctly, the Government can withhold as part of retention a maximum of 10%. And that's when the Contracting Officer, the new Contracting Officer took over. She started withholding 10%. And then when it came to March 1st, 2012, which was the target date, the initial target date for the completion, the Government withheld 100% of the progress payments and withheld all the payments for the diesel fuels and the generators. So all the payments. And the case really turns on the first breach concept. Basically, the concept was established in common law that an initial breach of contract of a lack of progress payments is, as long as it's material, that excuses performance. And that's what occurred here. The contractor never said, I refuse to perform unless, you know, I get an extra work or something like that. He said that I'm no longer financially able to perform because I have a million dollars coming from me. He submitted all the fuels paid for in cash between March 1st and the middle of April. That was around $600,000 paid invoices for the fuel and the generator. He submitted $300,000 of approved progress payments, none of which was paid. There has been no case. We go back a long time. I'm a little confused about part of that. Are you saying... What? I'm sorry, Your Honor. I'm a little confused about part of what you're talking about. You're saying you submitted invoices for $600,000 of fuel? Yes. For what dates? That occurred between March 1st and April 23rd. Well, what basis were you entitled to that fuel cost? Didn't you sign away that right in the modification that said after March 2012, you are wholly responsible for providing temporary power? Well, if you read the modification as reading out of the clause, again, I go back to over... Counsel will know. I go back to Whittaker and Davis who I clerked for back in the early 60s. All right? So it's a long time ago. All right? What Davis said is that you don't read out of the clause, out of the contract, mandatory clauses. Mandatory clause meaning when they signed 213, did the parties agree to throw out the disputes clause, the mandatory disputes clause, or the war risk clause that was specially put in this contract in Afghanistan? It didn't do that. You know, basically, everybody thought that the power plant would be built by this other contractor, right, that was building the power plant, right? And no one knew all these events that would occur in about a month later. Pooh 13 was signed in late September by the contractor early the first week in October of 2011 by the government. That's when the modification was signed. In November, the floods occurred. They flooded the entire site. What we're talking about here, what was the critical item on the site was the electrical distribution system, which is underground conduits, all right? In those conduits, there are about six inches. I'm not at all sure how this is relevant to the notion that you weren't required under the modification to provide the temporary power after March 2012. That's what the modification says. All these other things about changes in site conditions and things like that might have been compensable if you submitted claims or the likes, but it didn't permit you to anticipatorily repudiate your obligation under the mod, did it? But you still have, Your Honor, you still have excusable delay, you know, basically. Sure, and if you would have continued to perform the contract as you agreed to and paid for the fuel after March 2012, you probably could have submitted a claim saying we're entitled to some of that money back because the temporary power or whatever was not within our control  but you agreed on the face of the mod specifically without any reservation to provide temporary power after March. The fuel and the generators cost about $250,000 a month, all right? And the buildings was taking place on it. What happened is they didn't stop on March 1st and say, oh, we're not supplying the fuel. They bought the fuel. They paid for the generators between March 1st and March 31st. The government came back on, I guess it was March 28th or something like that, and says we're not going to pay you for the fuel. We're not going to pay you for your progress payments. We're going to hold back 100% of your progress payments also, all right? That was the first material breach of contract. Until that time, they were paying the invoices are found, paid invoices are found for the fuel and for the generator in the record. Well, sure. Until March, they were obligated by that modification to pay for it. After March, they weren't. All right. So they paid for it between March for almost two months, March and April, until they ran out of money. So they went beyond what they were required to do by the modification. Look, I think we're on a sidetrack on this fuel, frankly. I don't understand why you're arguing this point. Your point seemed to be, or at least your strongest point seemed to be, that other parts of the progress payments that don't relate to this fuel issue were withheld improperly, because they relied on the fact that you no longer had a reliable schedule and that there were issues with subcontractor payments. Yes. Why couldn't, if there's no schedule and there are problems with subcontractor payments, they withhold all of the progress payments? The board found, not discussed in the legal reasoning, the board found that, in fact, the schedule was submitted on April 4th, 2011, that showed, if you look at that schedule that was submitted, and the appendix, it showed that what was missing was the cable. The cable was at zero. It goes into the conduits. It was, basically, it was four-inch cable. One of the problems is that, because of this helicopter incident, the border between Pakistan and Afghanistan was closed by Pakistan because of that embargo, and it stayed closed for seven months, between the end of November, right after Thanksgiving, and July, when the Secretary of State apologized for the incident. And all 15,000 NATO trucks filled with supplies was held up during that period of time, and you couldn't truck in these reels. You remember, there's four inches of cables that go into a six-inch duct. How does any of this relate to the fact that you didn't submit the schedule or that you weren't paying your subcontractors? How is this related, that you weren't paying the subcontractors? Or that you didn't ever supply them a satisfactory schedule? I understand. This is an awful difficult contract. There were tons of delays caused by lots of different things, but what we're looking at is whether they were justified in withholding progress payments based upon your failure to deliver a new schedule and their perceived failure that you weren't paying their subcontractors. One, the schedule was delivered on April 4th. On that same day, the government had a meeting. But that's a finding of fact, isn't it? What? That's a finding of fact. Yes. We have to accept the facts found by the board. Could you give me the appendix where the board found that the schedule was delivered? But the board never found you delivered a sufficient schedule. The government continued. It didn't find that it wasn't. There was nothing. The government continuously rejected your schedule as insufficient. There's no finding that the government rejected that schedule. On April 4th, there is a CQC report by the government saying we're terminating the contract. Wait, wait, wait. What April are you talking about? Are you talking about April 2012? April 4th, 2012. Well, how does that help you? Because by that time, you'd already breached in March or at least some time after refusing to make the payments for the fuel. I think we're getting wound up in facts again. If you want to spend your time arguing about whether there's a finding in the board that you didn't submit a sufficient schedule, you can. But what I'm more interested in is the legal argument about whether the government can deny payments based upon an insufficient schedule. Okay. May I bring this up? I have it. I have a car in front of me. All right. B and C, which is incited by the board, B talks about an updated schedule. And C is if the contractor fails to deliver an updated schedule. Okay. The contracting officer may terminate. So is your position essentially, because I'm looking at A too, if you deliver an initial schedule that's accepted, then the only alternative for the government, if you fail to deliver an updated timely schedule, is default? Right. And that's in... Why would you have B in there at all? Because that's almost what common law is. Okay? Because what you're trying to do... Can you just address the words in A that say the contracting officer fell within five days or within another period of time determined by the contracting officer to deliver a schedule? Why doesn't that suggest that the contracting officer, when it finds the initial schedule has gotten out of line, requests a revised schedule? And if it's not met, that's part of A. Because the original schedule is baseline. So what they're saying is, until you give me something for me to compare, our baseline schedule, your first schedule, there's nothing for us to compare. We're not going to release any payments to you, as far as that goes, because we use that baseline schedule to compare all the updates and everything else. All right? And that's what makes sense. To answer your other question, Your Honor, Judge Hughes, is that when you elect to hold back, to withhold progress payments that you're supposed to make, you're saying, I'm not going to pay you, Mr. Contractor. Let's assume that you're the government. I'm not going to pay you, but I want you to finish. I want you to be on that job for next year, pay a quarter million dollars every month, and be on that job because that's what you signed up for. Forgetting about what Judge Davis says about sticking your head in a lion's mouth, hoping it would turn out to be a vegetarian. That's what you're saying, that the contractor was that dumb that it signed this Proof 13 without any recourse to a default clause, without any recourse to the excusable delays, without any recourse for government concurrent delay, because there was never any permanent power. To this day, I believe, there's no permanent power. There to service these additional buildings. And that's what basically you're saying. The problem on the first breach, when you do first breach, you're saying to the other breaching party, I'm not paying you, but I want you to do the contract. Well, you can't have it both ways. And that's what the payment clause, when they drafted the FARs, and maybe I'm just too old for this thing. When the FARs was drafted, that's what they looked at, on the scheduling clause. Yes, if you don't come up with a schedule, and you don't have approved schedule, we can terminate you. But you can't have it both ways. You can't have, I'm not going to pay you, but you better perform your contract. And that's what it all boils down to. And that's not what the FAR says. That's not what the contract says. And that's why, you know, when the FARs were revised to eliminate the 10% retention, it said if you don't, if you're tardy, and you don't perform correctly, they can hold back a maximum of 10% retention, because they know they can break any contractor by holding back all payments. And you're saying that, forgetting about the first breach situation, you can hold back 100% of payments, you can hold back 100% of the fuel and the generators, and saying, Mr. Contractor, you're still going to go ahead and continue performing the remaining 10% of the contract. You're going to supply fuel for the existing buildings, for the 11 existing buildings at a quarter million bucks every month from now to whenever we get the plant built, if ever. Council, I don't think you need to shout at us. Oh, I'm sorry, Your Honor. I mean, you know, one of the things is, and Steve knows, I'm a big fan of Judge Whitaker, he had a great sense of justice, okay? He had a great sense of justice, and Judge Davis, you know, and they were opposite, was such a great academic and knowledgeable person about the law. But between the two of them, that's what I learned. I learned what a sense of justice is, and I learned what the law really is, you know, and what this court is really about. And Vance, I still feel that that's what we're here for. Let's hear from the other side, and we'll save you a rebuttal time. Yeah, thank you. Thank you, Your Honor. Mr. Gilead, tell us what went wrong here. Obviously, these circumstances were extraordinarily difficult, and the mod was signed to provide fuel, to continue to provide fuel at the contractor's cost, but it's hard to reconcile that with, instead of paying the 90%, as seems to have been agreed in the contract, there was a total termination. What happened? Well, the termination, of course, was because of, as the board judge found, anticipatory repudiation. He cited a long string of events starting on April 14, 2012, and culminating on April 23, 2012, where basically Highland said, we're not going to perform the contract. There was lots of back and forth. He was sure you're not going to perform the contract. We're not going to perform the contract. Eventually, he came down to negotiating, tell us when you're going to turn the power off, and when they did, it was turned over to another contractor who supplied the power. This case is really about the failure to earn payment. The law at 10 U.S.C. 2307 cited by the board judge explains that in order to be paid, three things have to be present. Number one, the contractor must, the progress payments may only be paid as commensurate with the work actually accomplished. Number two, it has to be according to the contract specifications. And number three, it has to be accompanied by a prompt payment certificate, which not only certifies that the work has actually been done, but that the subcontractors have been paid. And just about all of this job was subcontracted out. There was plenty of testimony to the fact that that was not going on at all. And I can show you in the accounting documents, first of all, there was no bills whatsoever for fuel here. What's at issue is prompt payment requests 44 and 45. They were for a bunch of miscellaneous things. They totaled $315,000, and they were not paid. I can show you in the accounting documents not only that there was under CLIN 17 that there was no request for fuel at all. You can just go right down the pages and see 17, 000 requested. You can then look at the government's own estimate of how much work has been done, and you'll see that what they've said is that they've deducted, but not retained, the $315,000, having found the work simply was not in place. And then if you go further in the record also, at page 1235 is a history of payments, and you'll see that the retainages are well within 10%. In fact, even if you were to say, so the distinction is work having been accomplished in the first place, and the government obviously had no faith it was. And there's numerous documents in the record and numerous testimony to the effect of that Highland was consistently asking for more than it was due. The board, for example, found that in one case Highland had insisted they had performed 50 to 80% of the work, and they had performed no percent of the work. There was a document where the contract administrator wrote to Highland and said, you've claimed that work is being done, but we see no work being done. So there was a real lack of faith that any work was being done, and the government was not about to pay for work that was not done. But the documents themselves show that what work was credited as being done was only subject to the 10% retainage. So there seems to be a dispute as to who breached first, and the government's view is that Highland breached first by saying we're not going to perform anymore. That's right. And that's what the judge found. That was the basis upon which the contracting officer terminated on April 23rd. So that's the justification for not paying 100% rather than withholding just 10%. Well, again, the justification for not paying on progress payment request 44 and 45, which totaled $315,000, was that the fuel simply had not been delivered. So if you look at the documents that assess that, the pay estimates, for example, they're found at appendix page 878 and 884. They show $315,000 as having been deducted, and the reason there was a deduction was, as the contracting officer explained in her termination letter, found in appendix 76, the government was actually owed $903,000. That's because the survey had showed they had overpaid by $903,000, so they weren't about to pay another $315,000, and that's why at that government assessment of actual work delivered at appendix 878 and 884, you'll see $315,000 deducted, but nothing retained. Well, Highland points out that they were broke. They didn't have any more money, and that they were impeded by the Pakistani closure of the border. There were reasonable excuses, and they couldn't perform because they didn't have any more money. Right. So under this court's precedent in Meropecus, if they wanted to claim excusable delay or even compensable delay, they were required to submit a claim, and they never did that. The board judge found that neither in any of the documents, including their schedules, including the one submitted on April 4th, did they actually explain that there is excusable delay or give any excuses for why things weren't delivered. There was lots of testimony in this five-day trial, and the record is very long, I assure you. I think it's 1,629 pages, something like that. And there was lots of testimony about the flooding and so forth, and what the government witnesses testified to and what the judge credited was that these things were never shown to be on a critical path. So, for example, in the case of the Pakistani border closure, the contracting officer testified, if you would have shown me that you actually had those generators there, I could have contacted NATO officials. They could have determined whether they were actually there, and then I also would have assessed whether you needed them, whether they were on a critical path. Now, in fact, the generators, except for three that were allegedly stolen, did show up in February of 2012, several months, almost three months, before termination. So that was just never shown to be an excuse that actually affected the work. The rain, which was, I think, a day or two in November of 2011, was assessed. Contracting representatives were at the site every day and basically reported there was no work going on, and it was not on a critical path. I think in that case they said the permits had not even been obtained. It would have had to have been obtained in order for that work to do. So whether it was a Pakistani border closure, the rain, or other miscellaneous and generalized complaints, some of which had to do with the subcontractors themselves, which, of course, in a fixed-price contract, is the obligation of the contractor. It was no doubt a difficult environment, and the bidders knew this. As the board judge found, there was at least one or two questions where bidders said, won't there be a special CLIN in case we cannot deliver by the delivery date, which then was 2009, I think, and wound up being much later, 2012. And the government said, no, you have to be sure that if you cannot deliver these facilities ready for occupancy, including power, then you will provide temporary facilities and temporary power. And that was very difficult, and the government said, you have to price accordingly. I'm sorry. But this is really what seems to be so disturbing. Here you have an active war zone, and so this contractor, a very large contractor, agrees, and actually, and this seems to be an unusual circumstance, if difficulties arise, never mind, we'll pay 90%. Nonetheless, the difficulties did arise, and that the government just cut it off, and that doesn't seem to fit with the commitment and the basis for the 90%. No, and I want to make clear, Your Honor, that in this case, only 10% of actual earning work accomplished was with help, and you can see that in the government, in the pay histories at 1235. You can see it in the earnings reports that I identified to you, and you can also see it in the government's tally of their obligations. The government operates a checkbook, and for each item to be paid. In other words, you're saying the other 90% weren't due because there was no progress. 100% wasn't due because no work was accomplished. Again, the statute and the FAR and the payment clauses, also cited by the judge, make clear that without a contract, the contract is the basis for assessing whether work is in place. The government had doubts as to whether the work was in place. They were not about to pay for nothing. As the contracting officer explained at pages 2194 and 295 of her testimony, I simply can't pay on an allegation that you've done work, and given the inspections in the field, given submissions of inflated people on the job, of inflated progress, she simply had no confidence that work was actually being accomplished. If she had agreed that work was accomplished, she would then have had to pay whatever was left remaining on that particular activity's budget, and then she could have only subtracted 10%. There's no question about that. This was really a question about whether the work had been accomplished, whether it met the contract's standards, and whether the payment certificate was accurate. Those things are required by 10 U.S.C. 2703. They're required by the FAR Clause 52-232. They're required by the Basis for Payment Clause found at page 585, and in particular, Paragraph 3.4.4, which says, Payment shall be based on earnings, and payment shall not be made for work that contains quality defects. At Paragraph 3.4.3, at Appendix 587, it says, Provided the contractor has provided a complete schedule, these various reports shall serve as a basis for determining contract repayment. In other words, updated reports are required. And so having explained, as did other engineers, that if work was not going to be performed, they could not pay for it, but we agree 100% that if the work had been in place, if they'd gone out and inspected and found something that had been paid for, was met quality standards, they would have had to pay for it, and they could only have subtracted 10%. But as the contracting officer said in her termination letter found at Appendix 76, in fact, the government had overpaid on the job by $900,000. But even if you reject what I'm telling you and say, well, it sounds like they had a sufficient allegation they had done the work, and we should assess this under the Retainage Clause, $315,000 withheld is, by my count, and at that point the government had paid out $32,267,362 million. $32,267,362. And that's found in the pay history at Appendix Page 1235. $315,000 over $332 million equals 0.9%. That is 11.1 times less, or 1,110% less than the 10% that clause allows. So even if the 10% applied to these deductions, as the government called them, not retainages, the government was well within the 10% standard. Unless the Court has particular questions, I'm not sure I have anything further to add, because the judge basically found all the questions as fact. Whether the progress was actually made, whether work was actually accomplished, whether the parties agreed that this particular work, the power work, was severable. It was not. It was integral from the very beginning that these buildings, these barracks, have power. The board judge explained that without power there was no electricity, there was no water, there was no sewage, there were no ablution facilities, which were important for people of the Muslim faith, who washed their hands before praying. And when power was shut off, when temporary power was shut off, there were riots. Meanwhile, another contractor had been assigned and apparently defaulted on building the power plant. So there's two things going on there. There was a base operating, there was a location there with power, and as the board judge found in the opinion page 14, I think it's finding of fact 27, all the witnesses agreed that all the contractor had to do here was take the power to run cables through ducts and connect to existing power on the base. Now at some point they were thinking of expanding the base to house more soldiers than they wound up housing. If that had happened, there would have had to have been an expansion of the power plant. But instead of housing those additional soldiers, because of difficulties in expanding the power plant, they simply cut out the power plant out of both Highland's work and of a follow-on contractor's work. But there was sufficient power, and as I said the board judge credited the testimony, that in fact all they had to do was connect to the existing power, and that would have been sufficient to run power from Camp Hero over to the combat support battalion base, which they were constructing. So it would not have been worthless. It was important work, and, in fact, it was completed by a follow-on contractor. As the court has no further questions, I will end my remarks. Thank you, Mr. Galleron. Mr. Browd, you will have some rebuttal time if you wish. Two things I would like to raise is that on Appendix 146 is the site electrical distribution system request for proposal, and it was specifically saying that the existing electrical distribution system would not, and it capitalizes not, support the additional load for this project. So it was always stated that you need additional expansion at the power plant in order to have permanent power given to the CSB buildings. That's the first sentence on Appendix 146, and that never changed except for the attempted testimony that, oh, we could have shut off some Camp Hero buildings and provided power to these buildings. The other thing is that if you look at Appendix 1235, it is the Corps of Engineers' official progress payment history, where they say that they approved on March 1st, 2012, that first two-week period of time between March 1st and March 15th, $238,690 in progress payments, which is 44. In 45, they approved another $76,829, $315,000, and they said they're just not paying it. So basically, the government had approved those numbers. They had a group of Corps of Engineers go through the buildings and approved it. It wasn't until way after the termination they came up with this, oh, you only finished 86 percent, not 90 percent, of these 31 buildings. But the official documents showed that they approved the progress payments. You know, after all the Corps of Engineers looked at it, there is no finding by the board or by Judge Thrasher that there was any overpayment. You could read, you know, his 150-page opinion. You'll see nothing about the overpayments. And in his opinion. Thank you. Thank you. Thank you both. The case is taken under submission.